**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 11, 2007

LISA BROWN

     Plaintiff-Appellee,

v                                     No. 131358

MICHAEL BROWN, LUMBERMAN'S MUTUAL
CASUALTY INSURANCE COMPANY, and
HARLAN GARDNER,
     Defendants,

and

SAMUEL-WHITTAR STEEL, INC.

     Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

Plaintiff Lisa Brown was a security guard who had been assigned by her employer, Burns International Security (Burns), to provide security for defendant

Samuel-Whittar Steel, Inc.[1]  Michael Brown (Brown), an employee of defendant and no relation to plaintiff, raped plaintiff at defendant's Detroit facility.  Brown had no prior criminal record, no history of violent behavior, and certainly no history indicating that he harbored a propensity to commit rape.  However, plaintiff alleges that Brown routinely made crude, sexually explicit comments to her when they interacted at defendant's facility.  We are asked to consider whether defendant's knowledge of these comments created a basis for holding defendant, Brown's employer, liable for the rape committed by Brown.

We hold that where an employee has no prior criminal record or history of violent behavior indicating a propensity to rape, an employer is not liable solely on the basis of the employee's lewd comments for a rape perpetrated by that employee if those comments failed to convey an unmistakable, particularized threat of rape.  The Court of Appeals reliance on this Court's decision in *Hersh v Kentfield Builders, Inc*, 385 Mich 410; 189 NW2d 286 (1971), was misplaced.  Because Brown did not commit prior acts that would have put his employer on notice of Brown's propensity to commit rape and Brown's workplace speech was not predictive of this criminal act, defendant cannot be held liable for the rape.

---

[1] Plaintiff filed suit against Samuel-Whittar Steel, Michael Brown, and Harlan Gardner.  A default judgment was entered against Brown when he failed to respond to plaintiff's suit.  Plaintiff failed to serve Gardner.  Neither Brown nor Gardner is part of this appeal.  Therefore, we refer to Samuel-Whittar Steel singularly as "defendant."

We reverse the judgment of the Court of Appeals, reinstate the trial court's order granting summary disposition in favor of defendant, and remand this case to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Beginning in early 2000, plaintiff Lisa Brown worked for Burns as a security guard.[2] During this time, Burns assigned plaintiff to work the night shift at defendant's Detroit plant. Plaintiff's duties during the night shift included answering and transferring telephone calls, inspecting employees and truck drivers as they left the facility, and making nightly rounds through the plant.

Michael Brown worked for defendant as a foreman. The record does not disclose anything remarkable about Brown or his tenure with defendant. Brown did not have a criminal record until he pleaded no contest to attempted third-degree criminal sexual conduct arising out of his attack of plaintiff. At the time of the incident, Brown also worked the night shift.

Although it is unclear when the comments began, plaintiff alleges that Brown routinely made very crude, offensive sexual remarks to her.[3] Plaintiff

---

[2] Although the dissent characterizes plaintiff as Brown's "subordinate," *post* at 6 n 3, we note that plaintiff and Michael Brown worked for different employers.

[3] Plaintiff summarized the nature of these remarks when she testified at deposition that Brown "would tell me how he loved my long hair and how he would want to f*** me and pull my long hair and umm, just how I would walk
(continued…)

3

testified that on at least three occasions she complained about Brown's offensive comments to one of defendant's plant managers, Harlan Gardner.[4] According to plaintiff, she last complained about Brown's language in August or September 2000. Plaintiff also testified that she told another Burns security guard, Kim Avalon, about Brown's lewd statements and that Avalon had been present during such an exchange between Brown and plaintiff. Plaintiff claims that the verbal harassment continued until the rape occurred in November 2000.[5]

On November 17, 2000, plaintiff was raped by Brown. As plaintiff made her nightly rounds through the plant, she noticed that a door leading into the administrative offices was ajar. As she walked toward that part of the office building, plaintiff met Brown. Brown followed her into the offices and helped her turn off the lights and close the doors of the individual offices. After the office

_____

(…continued)
through the plant and he liked how I shaked [sic] my a** and I had big t*** and just all the terrible things like that."

[4] Plaintiff testified that she told Gardner "how uncomfortable I felt about Michael Brown saying these things and [asked] if he could tell him to stop."

[5] The dissent's general assertion that Brown made his comments to plaintiff "late at night when he was acting as her supervisor and no one else was around" and that "[h]e made them for no one to hear but her," *post* at 10-11, requires the dissent to speculate about an undeveloped record. The record indicates that Brown and plaintiff worked during the afternoon shift in the same time frame before they both were reassigned by their respective employers to work during the night shift. Moreover, plaintiff testified at her deposition that Brown made comments to her during the afternoon shift. Thus, it is simply unclear from the record how many of Brown's comments were made while the two worked during the night shift and how often he made his comments while the two were alone or in the presence of others.

area was secured, Brown forced plaintiff into a nearby women's restroom inside the building and raped her. Plaintiff immediately reported the incident to the police, who arrested Brown. Brown later pleaded no contest to a charge of attempted third-degree criminal sexual conduct. Understandably, plaintiff has testified that she suffered psychological trauma as a result of the rape and, as a result of this trauma, cannot return to work.

Plaintiff filed suit against defendant, Brown, and Harlan Gardner, seeking to recover damages caused by the rape, including damages for physical and psychological injury, lost wages, and medical expenses. She asserted two theories of liability against defendant: first, that defendant was vicariously liable for Brown's actions under the doctrine of respondeat superior; and, second, that because she had complained about Brown's lewd comments, defendant had notice of Brown's propensity to commit violent acts and therefore defendant was negligent in failing to take reasonable steps to prevent the rape.

Defendant moved for summary disposition, which the trial court denied. After the parties conducted further discovery, defendant renewed its motion for summary disposition. The trial court granted this motion, ruling that there was no genuine issue of material fact concerning whether defendant was liable for the unforeseen criminal acts of Brown.

Plaintiff appealed to the Court of Appeals, challenging the dismissal of her negligence claim.[6]  In a published opinion, deciding what it labeled a case of first impression, the panel reversed the trial court's order and held that plaintiff had presented a genuine issue of material fact that defendant knew or should have known of Brown's criminal sexual propensities and, therefore, was liable under a negligence theory.[7]  The panel cited in support this Court's decision in *Hersh*  and its own decisions in *Samson v Saginaw Professional Bldg, Inc,*[8] and *Tyus v Booth,*[9] although it conceded that all of those cases involved individuals who had had a history of engaging in prior violent acts.  It also recognized that those cases did not consider "whether sexually aggressive and predatory *words* are sufficient to put an employer on notice of its employee's propensity for violence."[10]  Nevertheless, the Court of Appeals determined that "the language and the circumstances were sufficient to create a jury question regarding whether Whittar knew or should have known of Michael Brown's violent propensities."[11]

---

[6] Plaintiff did not pursue the dismissal of her respondeat superior claim, and it is not before us.

[7] *Brown v Brown*, 270 Mich App 689; 716 NW2d 626 (2006).

[8] 44 Mich App 658; 205 NW2d 833 (1973).

[9] 64 Mich App 88; 235 NW2d 69 (1975).

[10] *Brown*, 270 Mich App at 699 (emphasis in original).

[11] *Id.* at 700.

6

Defendant sought leave to appeal in this Court. We heard oral argument on the application. In lieu of granting leave to appeal, pursuant to MCR 7.302(G)(1), we reverse the judgment of the Court of Appeals.

## II. STANDARD OF REVIEW

This Court reviews de novo a decision to grant a motion for summary disposition.[12] We review a motion brought under MCR 2.116(C)(10) by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party.[13] Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law.[14] Whether one party owes a duty to another is a question of law reviewed de novo.[15]

## III. ANALYSIS

### a. Defendant owed no duty to plaintiff to prevent the rape because defendant had no notice of Brown's propensity to rape

Defendant argues that the Court of Appeals erred because Brown's words alone could not have put defendant on notice of Brown's propensity to rape.

---

[12] *City of Taylor v Detroit Edison Co*, 475 Mich 109, 115; 715 NW2d 28 (2006).

[13] *Reed v Breton*, 475 Mich 531, 537; 718 NW2d 770 (2006), citing *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[14] *Greene v AP Products, Ltd*, 475 Mich 502, 507; 717 NW2d 855 (2006).

[15] *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

Therefore, defendant argues that it owed no duty to plaintiff in this case. We agree.

In order to make out a prima facie case of negligence, the plaintiff must prove the four elements of duty, breach of that duty, causation, and damages.[16] "The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff."[17] "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person."[18] This Court has elsewhere defined "duty" as

> a "'question of whether the defendant is under any obligation for the benefit of the particular plaintiff' and concerns 'the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other.'" "'Duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." [*Buczkowski v McKay*, 441 Mich 96, 100-101; 490 NW2d 330 (1992) (citations omitted).]

In *Valcaniant v Detroit Edison Co*,[19] this Court described the factors that are relevant "[i]n determining whether a legal duty exists," such as the

> "foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and . . . the burdens

---

[16] *Id.* at 463.

[17] *Id*.

[18] *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977).

[19] 470 Mich 82, 86; 679 NW2d 689 (2004).

and consequences of imposing a duty and the resulting liability for breach." [*Id.,* quoting *Buczkowski,* 441 Mich at 101 n 4 (citing Prosser & Keaton, Torts [5th ed], § 53, p 359 n 24).]

When performing an analysis of whether a duty existed, this Court considers the foreseeability of harm to the plaintiff, although the "'mere fact that an event is foreseeable does not impose a duty'" on the defendant.[20]

This case involves the initial question whether an employee's criminal activity is foreseeable by his employer and whether the employer is liable for that criminal activity. In *MacDonald v PKT, Inc,*[21] this Court dealt with the foreseeability of criminal acts committed by invitees and limited the duty owed by an invitor. We stated:

> A premises owner's duty is limited to responding reasonably to situations occurring on the premises because, as a matter of public policy, we should not expect invitors to assume that others will disobey the law. A merchant can assume that patrons will obey the criminal law. This assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee. It is only a present situation on the premises, not any past incidents, that creates a duty to respond.
>
> Subjecting a merchant to liability solely on the basis of a foreseeability analysis is misbegotten. Because criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. However, even police, who are specially trained and equipped to anticipate and deal with crime, are unfortunately unable universally to prevent it. This is a testament to the arbitrary nature of crime. Given these realities, it is unjustifiable to make merchants,

---

[20] *Buczkowski,* 441 Mich at 101, quoting *Samson*, 393 Mich at 406.

[21] 464 Mich 322; 628 NW2d 33 (2001).

who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties.[22]

As in *MacDonald*, similar concerns of foreseeability and duty arise in the negligent retention context when we consider whether an employer may be held responsible for its employee's criminal acts. Employers generally do not assume their employees are potential criminals, nor should they. Employers suffer from the same disability as invitors when attempting to predict an employee's future criminal activity.

The harm suffered by plaintiff in this case was a criminal rape. It is argued that this rape was a foreseeable result of Brown's offensive speech. We disagree. Without question, Brown's words were crude and highly offensive. Plaintiff's complaints to one of defendant's plant managers that Brown's comments were offensive and made her uncomfortable, when coupled with her request that defendant make Brown cease making such comments, gave defendant awareness of Brown's propensity for vulgarity and arguably positioned her for remedies as provided in *McClements v Ford Motor Co.*[23] However, an employer can assume

---

[22] *Id.* at 335 (citations omitted).

[23] 473 Mich 373; 702 NW2d 166 (2005). After the trial court adjudicated this case, this Court decided *McClements*, in which we held that a common-law claim for negligent retention cannot be premised on workplace sexual harassment, because a plaintiff's remedies for any act of sexual harassment in the workplace are those provided by the Civil Rights Act (CRA). *Id.* at 382-383. In

(continued…)

that its employees will obey our criminal laws. Therefore, it cannot reasonably anticipate that an employee's lewd, tasteless comments are an inevitable prelude to rape if those comments did not clearly and unmistakably threaten particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim. Comments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry comment inexorably results in a violent criminal assault.

We do not hold that an employee's words alone can *never* create a duty owed by the employer to a third party. This obviously would be an entirely different case if Brown had threatened to rape plaintiff and defendant was aware of these threats and failed to take reasonable measures in response.[24] Justice Cavanagh has no use for a traditional test of foreseeability. He would allow a jury to impose liability on an employer if, in retrospect, somehow the harm was avoidable. However, we will not transform the test of foreseeability into an

_____

(…continued)
*McClements*, we also clarified that a nonemployee may sue under the CRA if he or she is sexually harassed and the defendant affected or controlled a term, condition, or privilege of the worker's employment. *Id.* at 389. As in *McClements*, the availability of this statutory remedy augers against further expanding the scope of common-law negligent retention to the facts of this case. We note, however, that plaintiff did not file a CRA claim in this case. The record is thus undeveloped with respect to whether such a claim would have succeeded here and we decline to speculate further.

[24] Although Justice Cavanagh attempts to equate Brown's unwanted invitations with a declaration of intent to rape, none of the comments directed at plaintiff in this case approached a particularized threat of criminal violence. Not even plaintiff believed she was being threatened with potential rape.

"avoidability" test that would merely judge in hindsight whether the harm could have been avoided.[25]   Brown's comments, standing alone, were insufficient to place defendant on notice that Brown was a rapist.

To supply further context to Brown's comments, it is noteworthy that not even plaintiff suspected that Brown would physically attack or rape her.  While she testified at her deposition that she thought Brown was "weird," she stated that she did not fear that he would perpetrate a physical assault.  Plaintiff never testified that Brown had ever offensively touched her before November 17, 2000.  It is inconceivable that defendant's management officials should have anticipated or predicted Brown's behavior any better than plaintiff, who directly witnessed the tone and tenor of Brown's offensive statements and yet indicated that she never feared for her physical safety.  Therefore, the lack of foreseeability of the harm in this case weighs definitively against imposing a duty on defendant.

Moreover, in addition to the lack of foreseeability of the harm, other important considerations that this Court identified in *Buczkowski* convince us that the relationship between plaintiff and defendant does not give rise to a duty under these circumstances.  The moral blame attached to the conduct in question, a rape, rests with the perpetrator, Michael Brown, not with his employer.  Also, there was

---

[25] This is not the first occasion in which Justice Cavanagh has articulated a position that would essentially eliminate foreseeability in favor of the imposition of strict liability on a business whenever a person is harmed.  See *Anderson v Pine Knob Ski Resort, Inc*, 469 Mich 20, 29; 664 NW2d 756 (2003) (Cavanagh, J., dissenting).

a low degree of certainty of rape because there was not a "close" connection between Michael Brown's statements and the resulting rape. And imposing a duty on defendant would not effectively further a policy of preventing future harm, and would impose an undue burden on defendant and all employers.

In our estimation, the legal duty articulated by the Court of Appeals would invite burdensome, over-inclusive employer regulation of employee workplace speech. Modern workplace speech is, at times, boorish and undesirable, but, depending on what precisely is said, it may be no predictor at all of future criminal behavior, as is the case here.[26] As a general rule, an employer cannot accurately predict an employee's future criminal behavior solely on the basis of the employee's workplace speech. An employer diligently seeking to avoid such broad tort liability would inevitably err on the side of over-inclusiveness and cast a wide net scrutinizing *all* employee speech that could be remotely construed as threatening. However, as this Court astutely observed in *Hersh*, "'not every infirmity of character'" is sufficient to forewarn the employer of its employee's violent propensities.[27] If every inappropriate workplace comment could supply sufficient notice of an employee's propensity to commit future violent acts, a

---

[26] Contrary to our dissenting colleague, who finds that Brown's comments were beyond boorish, we note that "boorish" accurately describes Brown's words. "Boorish" is defined in *Random House Webster's College Dictionary* (2001) as "unmannered; crude; insensitive." The same dictionary defines "crude" as "vulgar" and "vulgar" as "indecent; obscene; lewd."

[27] *Hersh*, 385 Mich at 413, quoting 34 ALR2d 390, § 9.

prudent employer operating under the duty fashioned by the Court of Appeals *ought* to treat every employee who makes inappropriate workplace comments as a potentially violent criminal. The additional social and economic costs associated with this type of monitoring, not to mention the burden on otherwise innocent employees who make inappropriate comments in the workplace but harbor no violent propensities, weigh further against imposing the duty created by the Court of Appeals.

> b. *Hersh* does not provide support for the expanded duty imposed by the Court of Appeals in this case

In concluding that plaintiff created a jury-submissible question of negligence, the Court of Appeals relied on this Court's decision in *Hersh*. Regarding defendant's duty to plaintiff, the panel opined that there is

> no requirement, in *Hersh* or elsewhere, that an employer must know that the employee had a propensity to commit the actual crime that occurred. Rather, it is sufficient under *Hersh* if the employer knew of the employee's "impropriety, violence, or disorder," in short, whether the employer could have reasonably foreseen the employee's "violent propensity," that is, his or her "natural inclination or tendency" to violence. Given what Michael Brown said to Lisa Brown and what Lisa Brown reported to Whittar's plant manager, we conclude that a jury could find that Whittar should have, under these circumstances, known of Michael Brown's propensity for sexual violence. There was, therefore, a genuine issue of material fact, and the trial court erred when it granted summary disposition on Lisa Brown's negligence claim. The question whether Whittar knew or should have known of Michael Brown's vicious propensities should not have been determined by the trial court as a matter of law, but by the jury. [*Brown*, 270 Mich App at 700-701.]

14

In *Hersh,* the plaintiff brought a negligence claim against the defendant, Kentfield Builders, Inc., arising out of an unprovoked attack inflicted by one of the defendant's employees on the plaintiff. The plaintiff, a kitchen cabinet salesman, had scheduled a meeting with the president of Kentfield Builders at one of the defendant's model homes, and while he waited to meet with the president, he was seriously injured by Benton Hutchinson, an unskilled laborer employed by the defendant who ten years earlier had been convicted of manslaughter. The plaintiff alleged that the defendant was liable for his injuries because it knew or should have known that Hutchinson harbored vicious and murderous propensities.

The plaintiff received a favorable jury verdict, which the Court of Appeals set aside because it found no evidence, notwithstanding Hutchinson's prior manslaughter conviction, revealing that Hutchinson had "assaultive propensities" or that Kentfield Builders acted unreasonably in hiring him.[28]

This Court unanimously reversed the judgment of the Court of Appeals and reinstated the jury's verdict in *Hersh*, holding that whether Kentfield Builders knew or should have known of Hutchinson's vicious propensities was a jury question that could not be decided as a matter of law. In its analysis, this Court quoted with approval a headnote from *Bradley v Stevens*,[29] which stated that

---

[28] *Hersh v Kentfield Builders, Inc*, 19 Mich App 43; 172 NW2d 56 (1969).

[29] 329 Mich 556; 46 NW2d 382 (1951). In *Bradley*, the defendant, the owner of an auto service shop, was sued by a customer who had been physically
(continued…)

15

"[a]n employer who knew or should have known of his employee's propensities and criminal record before commission of an intentional tort by employee upon customer who came to employer's place of business would be liable for damages to such customer." [*Hersh*, 385 Mich at 412.]

This Court also quoted with approval the statement from 34 ALR2d 390, § 9, that

"[a]s has already been noted, a duty imposed upon an employer who invited the general public to his premises, and whose employees are brought into contact with the members of such public in the course of the master's business, is that of exercising reasonable care for the safety of his customers, patrons, or other invitees. It has been held that in fulfilling such duty, an employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer. *The employer's knowledge of past acts of impropriety, violence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer who selects or retains such employee in his service that he may eventually commit an assault, although not every infirmity of character, such, for example, as dishonesty or querulousness, will lead to such result.*" [*Hersh*, 385 Mich at 412-413 (emphasis added).]

In its analysis, the panel below emphasized selective portions of this passage from *Hersh*. Quoting *Hersh*, the panel held that "it is sufficient under *Hersh* if the employer knew of the employee's 'impropriety, violence, or disorder,' in short, whether the employer could have reasonably foreseen the

_____

(…continued)

attacked by an employee in an attempted rape. This Court affirmed a judgment of no cause of action that had been entered in favor of the defendant, agreeing with the trial court that the defendant would have been liable only if he *knew or should have known* of his employee's propensities and criminal record. Significantly, although the defendant knew that the employee had been convicted of nonsupport, the record indicated that he had no knowledge that the employee had recently been charged with common-law rape.

16

employee's 'violent propensity,' that is, his or her 'natural inclination or tendency' to violence."[30]  What the panel omitted from its quotation from *Hersh* was the complete statement that "'*[t]he employer's knowledge of past acts* of impropriety, violence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer . . . .'"[31]  This Court emphasized in *Hersh* that it is the employee's *known past acts* that provide a basis for the employer's knowledge of the employee's "impropriety, violence, or disorder" and that those acts potentially place an employer on notice of the employee's violent propensities.

Beyond the fact that the Court of Appeals misconstrued this portion of *Hersh*, *Hersh* is largely inapposite to this case.[32]  The employee in *Hersh* who

---

[30] *Brown*, 270 Mich App at 701.

[31] *Hersh*, 385 Mich at 413, quoting 34 ALR2d 390, § 9 (emphasis added).

[32] The Court of Appeals also relied on *Samson v Saginaw Professional Bldg, Inc*, 44 Mich App 658; 205 NW2d 833 (1973), and *Tyus v Booth*, 64 Mich App 88; 235 NW2d 69 (1975).  The panel recognized that neither case provided direct support for its holding.  Therefore, these cases are also not central to our analysis.

*Samson* did not address an employer's negligent retention of an employee. It addressed a landlord's duty to protect its tenants' employees from individuals with violent propensities in the common areas of the building over which the landlord had responsibility.  In *Samson*, the plaintiff worked in a building owned by the landlord defendant, which leased space to the plaintiff's employer.  Another tenant in the building was the Saginaw Valley Consultation Center, an agency that provided outpatient care for released mental patients.  The plaintiff was attacked by a mental patient as they rode the elevator in the building.  A split Court of Appeals panel held that the landlord defendant owed a duty to take reasonable

(continued…)

17

assaulted the third party had a criminal record and had committed a prior, violent

criminal *act*. The panel below acknowledged that Brown had not committed prior

*acts* that would have put defendant on notice of Brown's propensity to commit any

criminal act, including rape. This fact is enough to distinguish this case from

*Hersh*. The more important question, which *Hersh* did not address, is whether an

employer is entitled to judgment as a matter of law when the sole basis for

imposing liability for an employee's rape of a third party is the employee's lewd

and offensive *comments*. As we discussed earlier, however weak or strong a prior

act of violence may be as a predictor of future violence, the workplace speech in

this case and the entire absence of any history of violence provide an insufficient

predicate for imposing a duty of care of the kind the panel below recognized.

---

(…continued)

precautions to protect its tenants from mental patients with a propensity toward violence who would be visiting the consultation center.

      *Tyus* involved an employer's liability under a theory of negligent retention. In *Tyus*, the plaintiffs sued the owner of a service station whose employee assaulted the plaintiffs without provocation. One theory of liability advanced by the plaintiffs was that the owner had negligently exposed the public to an employee with known violent propensities. The Court of Appeals, citing *Hersh*, affirmed the trial court's grant of summary disposition in favor of the defendant. Significantly, the panel noted that the defendant had no actual prior knowledge of the employee's propensity for violence, and concluded that the defendant "was not required to conduct an in-depth background investigation of his employee." *Id.* at 92. Moreover, it held that "[a]n employer is not absolutely liable for assault committed by his employee," but only owes a duty "to use reasonable care to assure that the employee known to have violent propensities is not unreasonably exposed to the public." *Id.*

18

## IV. RESPONSE TO THE DISSENT

While we have sought to maintain in our duty analysis a key tort concept—foreseeability—Justice Cavanagh in his dissent has swept this concept aside, concluding that any inappropriate workplace speech by an employee that is followed at some point by a criminal act is sufficient to create a jury-submissible question of negligent retention. In contrast, we have attempted to preserve a workable rule of foreseeability in this context, limiting employer liability to instances in which an employee has done or uttered something of which the employer has or should have knowledge that affords genuine notice of that employee's criminal propensities. This is not a novel or surprising requirement. By eliminating this link of foreseeability, which is what Justice Cavanagh advocates, an employer would be held strictly liable for employee misbehavior, whether foreseeable or not.

Justice Cavanagh emphasizes that once defendant learned of Brown's harassing comments, it was on notice of Brown's "habits, temperament, or nature." But this conclusion, of course, begs the question: Brown's habits, temperament, or nature signified his propensity *to do what*? Did his words demonstrate his "habit, temperament, and nature" to continue to harass women, in particular plaintiff, with foul and unwanted sexual comments, or did they demonstrate his "habit, temperament, and nature" to commit violent rape? Justice Cavanagh's theory of liability is simply that defendant was on notice that Brown was a rapist because he made unwanted sexual comments. However, evidence of

making unwanted sexual comments is not evidence of a propensity to commit violent rape. It simply cannot be the responsibility of the employer to determine with clairvoyant accuracy whether conduct of one sort might bear some relationship to conduct of a completely different sort. Rather, if an employee has not done or said anything that would afford a reasonable employer notice of a propensity to rape or commit some other type of criminal conduct, there is no sound legal or commonsense basis for the imposition of tort liability on an employer.

Justice Cavanagh states, "I fail to see why it would not be more desirable to have employers scrutinize threatening speech than to ignore it when reported and have an innocent employee raped."[33] In light of the causal link, illogical as it is, that Justice Cavanagh forges between defendant's alleged "nonscrutiny" and the ensuing rape, it is worth asking Justice Cavanagh to identify the purpose of the "scrutiny" that he urges. It is not clear whether proper scrutiny means that an employer must merely confirm that the employee's speech was "crude," or if the utterance of any crude statement is grounds for termination. It is equally unclear if, under Justice Cavanagh's approach, an employer could successfully "rehabilitate" its "tainted" employees, or if it must inevitably fire them. Finally, Justice Cavanagh's assertion offers no guidance concerning whether an employer's duty to scrutinize is limited to employee speech or whether it could

---

[33] *Post* at 9.

20

extend to an employee's seemingly harmless but quirky behavior. These are but a few of the many practical questions Justice Cavanagh's theory of liability poses without answering.

If Justice Cavanagh's position were to prevail, the consequences would be considerable. Any rational employer would protect itself by refusing to hire or by terminating employees whose behavioral clues might allow courts, in hindsight, to hold the employer responsible if the employee commits a crime. In some instances, employers would find themselves in the unenviable position of seeking to protect themselves from liability for "negligent retention," while also avoiding liability under various antidiscrimination laws governing employment.[34]

---

[34] Indeed, Justice Cavanagh would impose a "Catch-22" duty on employers to detect their employees' criminal propensities even though employers are not fully equipped to reasonably fulfill that duty. A part of the judicially created common law, a negligent retention action works interstitially in the gaps of the positive law enacted by our Legislature, such as the CRA, or applicable federal law enacted by Congress. If the Legislature has determined as a matter of public policy that fruitful information regarding previous employee "conduct" is off limits, thus hampering an employer from comprehensively investigating its employees' criminal propensities, we ought not to *broaden* our common law and create insurmountable barriers for employers working to fulfill their common-law duties. See, e.g., MCL 37.2205a (prohibiting an employer from requesting, making, or maintaining a record of information regarding a misdemeanor arrest if a conviction did not result). This is especially true in Justice Cavanagh's world, where virtually any piece of information then available to an employer about an employee's speech, behavior, or actions could, when judged in hindsight, create a jury-submissible question of negligence if the employee later commits a criminal act. In light of the expansive tort liability to which Justice Cavanagh would expose employers, they should not face the challenge of accurately forecasting their employees' future criminal acts when the *Legislature* has curtailed the scope of information at their disposal.

In other instances, employees who have committed crimes in the past, but have presumably repaid their debts to society, would find it more difficult to secure employment, as would job applicants who have been identified by employers, or by the experts that employers would retain, as having the potential for negative behavioral actions, including crimes. It goes without saying that the effect of this new regime would, in both subtle and not-so-subtle ways, fall most heavily on social groups with the highest prevalence of past criminal behavior.[35] Unlike Justice Cavanagh, we refuse to create a new standard for imposing tort liability on employers and thereby render large numbers of job applicants effectively unemployable.[36]

## V. CONCLUSION

We conclude that defendant may not be held liable for the rape perpetrated against plaintiff by Brown. The Court of Appeals expanded defendant's duty on

---

[35] See, e.g., Human Rights Watch Press Backgrounder, Percentage of Adult Men (Age 18-64) Incarcerated, by Race, available at <http://www.hrw.org/backgrounder/usa/race/pdf/table3.pdf.> (accessed June 6, 2007); see also Incarcerated America, Human Rights Watch Backgrounder, available at <http://www.hrw.org/backgrounder/usa/incarceration> (accessed June 6, 2007).

[36] Once again, we in no way make light of the comments that Brown made in this case. Although these comments did not put defendant on notice of a propensity to rape, they were obviously exceedingly inappropriate and offensive. However, the issue here is not whether the comments were offensive, or a violation of our Civil Rights Act, see MCL 37.2103(i), but whether the comments placed defendant on notice that a rape was foreseeable and thereby made defendant liable for the rape.

the basis of plaintiff's complaints that Brown's sexually explicit and offensive comments made her uncomfortable.   Defendant could not reasonably have anticipated that Brown's vulgarities would culminate in a rape.   We simply disagree with the Court of Appeals "that a jury could find that [defendant] should have, under these circumstances, known of Michael Brown's propensity for sexual violence."[37]   Accordingly, we reverse the judgment of the Court of Appeals, reinstate the trial court's order granting summary disposition in favor of defendant, and remand this case to the trial court for further proceedings consistent with this opinion.

> Robert P. Young, Jr.
> Clifford W. Taylor
> Maura D. Corrigan
> Stephen J. Markman

---

[37] *Brown*, 270 Mich App at 701.

# STATE OF MICHIGAN

## SUPREME COURT

LISA BROWN

      Plaintiff-Appellee,

v                                No. 131358

MICHAEL BROWN, LUMBERMAN'S MUTUAL
CASUALTY INSURANCE COMPANY, and
HARLAN GARDNER,

      Defendants,

and

SAMUEL-WHITTAR STEEL, INC

      Defendant-Appellant.

_____

MARKMAN, J. (*concurring*).

I fully support the majority opinion and write separately only to elaborate upon its assertion that the dissent raises, but fails to answer, "many practical questions." *Ante* at 21. The rule proposed by the dissent, and the unanswered questions arising from that rule, would create confusion and uncertainty among employers throughout this state and, as such decisions inevitably do, require employers to devote more time to consulting with lawyers and fending off and negotiating lawsuits, and less time to managing their businesses.

The dissent would produce this result by making employers increasingly liable for the workplace crimes of their employees. Under what circumstances would this liability arise? Well, we really do not know, except that the dissent would leave it to juries to decide whether employers possessed sufficient information concerning an employee's "habits, temperament, or nature" to justify holding them responsible for the crimes of that employee. *Post* at 1. In either hiring or failing to fire an employee who later committed a crime, "[i]t is for the jury to determine whether [an employer] decided correctly." *Post* at 3 n 1. In the instant case, the dissent opines, crude statements uttered by an employee are sufficient to require a jury trial for an employer that failed to recognize that such statements might be a prelude to a violent rape.[1]

*Scope of the Assessment--* The dissent asserts that "[t]he obligation to assess its employee's fitness for a job falls on the employer, not on the victims of that employee's actions." *Post* at 3 n 1. What exactly does this mean in the real world of employers and employees? What is an employer's obligation of "assessment" such that it might avoid a lawsuit? What policies must be adopted by an employer to stave off a potentially destructive lawsuit when one of its employees commits a crime? Is it enough that an employer ascertains whether an

_____

[1] The question here is not whether an employee's statements evidenced sexual harassment or whether they constituted reprehensible or sanctionable behavior, but only whether the *employer* should be held accountable here for an *employee's* criminal behavior.

employee or a job applicant has a criminal record?  Is it enough that an employer also ascertains whether an employee or a job applicant has an arrest record?  Apparently none of this is enough because the perpetrator here had no criminal record.  What additional kind of "assessment" would the dissent require?  Would a psychiatric examination be required?  Would continuing psychological testing be necessary?  Must an employee's personal lifestyle be evaluated?  To what extent must an employee's interpersonal relationships at work be scrutinized?  In short, what type of "assessment" is required to ensure that an employee is a person of the requisite "habits, temperament, or nature" such that an employer will not be held accountable for future criminal misconduct by that employee?

*Interpreting the Assessment*-- What meaning must an employer ascribe to the results of the "assessment" it must undertake?  That is, what is an employer looking for in its "assessment"?  Would an unorthodox personal lifestyle apprise an employer that an employee is not a person of requisite "habits, temperament, or nature"?  What about unusual avocations, interests, politics, or reading and viewing preferences?  What about off-color jokes, crude rhetoric, extreme opinions, odd insights, idiosyncratic body language, strange demeanor, or politically incorrect views reflected in the workplace?  How extensively would an employee have to be questioned about such matters and with what specific purpose in mind?  What if an employer's "assessment" merely concluded that an employee's crude statements were simply crude?  What if the "assessment" merely concluded that an employee did not really intend to rape the person to

3

whom such crude statements had been directed? What conceivably might be discovered by an "assessment" of an employee making crude statements that would lead the dissent to exonerate an employer from liability for a subsequent crime by that employee? What kind of information from the "assessment" would place an obligation upon an employer to undertake further inquiry and what kind of information would not, to avoid the risk of a lawsuit? In short, what is a prudent and responsible employer required to do with the information generated from the "assessment"?

*Consequences of the Assessment*-- Finally, what actions must be undertaken by an employer that has performed the required assessment? Is it enough that an employer instruct an employee to cease certain conduct or behavior? If an employee or an applicant does have a criminal or arrest record, or if he or she has engaged in speech or conduct that might later be viewed by some as a prelude to a crime, is it obligatory that such person either not be hired or be fired? What type of criminal or arrest record would impose this obligation? Would a previous misdemeanor conviction, for example, of making a lewd comment or cursing in public sufficiently apprise an employer that a person is likely to commit a violent rape? What behaviors in the workplace, and what personal "habits, temperament, or nature" will sufficiently apprise an employer that a person "'may eventually,'" *post* at 10 n 9 (emphasis and citation omitted), commit a violent criminal offense? If professionally trained psychologists and psychiatrists are unable to predict criminal behavior, is it reasonable to obligate an employer producing machine

4

tools or automotive products to engage in this kind of speculation at the risk of a lawsuit? Is it ever relevant, as in this case, that the victim herself, working in close proximity with the criminal perpetrator, failed to recognize that he posed a threat to violently rape her? Why under these circumstances would a rational employer not simply fire any person whose "habits, temperament, or nature," when viewed in retrospect, might someday constitute the basis for a lawsuit? Why would any rational employer expose itself to the vagaries of litigation-by-hindsight ("the employer *should have* recognized," "the employer *should have* been aware," "the employer *should have* connected the dots," "the employer *should have* seen things as clearly as we do now") where it fails to predict unpredictable behavior if this could all be avoided by simply firing every odd or rude or quirky employee?

If employers are required to play by the dissent's rules, then the dissent owes them the courtesy of apprising them how they might comply. The dissent asserts that not "'every inappropriate workplace comment' . . . [or] 'inappropriate workplace speech . . . is sufficient to create a jury-submissible question,'" *post* at 6 n 5, but never endeavors to explain why this is so or where the line would be drawn between comments and conduct that place an employer in the courtroom and those that do not. That is, the dissent never endeavors to explain what an

5

employer can do to avoid tomorrow's crippling lawsuit when one of its employees acts in pursuit of his or her own personal demons and commits a crime.[2]

Stephen J. Markman

---

[2] The dissent's response to this concurring opinion is telling. I raise questions concerning the workability of its approach to the law and the dissent counts up these questions and calls them "histrionic." *Post* at 8 n 8. The dissent then eschews that it "fosters a general rule . . . ," and asserts that it is only issuing a decision applicable "in these particular circumstances." *Id.* But, of course, this is not the way the law operates. When we issue a decision, we set forth the law, not only for the instant case, but for all future cases as well. Our decisions establish precedent, and they instruct citizens who are not among the parties how they might conform to the law in order to avoid becoming a party in tomorrow's lawsuit. The dissent proclaims that it is simply "applying law to facts," *post* at 9 n 8, begging the question of what exactly that "law" is and what are the dispositive "facts." And what "facts" must be demonstrated by an employer in order not to breach that "law." These are several more questions that the dissent can add to its calculations and, doubtless, several more questions that it can choose not to answer.

STATE OF MICHIGAN

SUPREME COURT

LISA BROWN,

     Plaintiff-Appellee,

v                                     No. 131358

MICHAEL BROWN, LUMBERMAN'S MUTUAL
CASUALTY INSURANCE COMPANY, and
HARLAN GARDNER,

     Defendants,

and

SAMUEL-WHITTAR STEEL, INC,

     Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

I dissent from the majority's conclusion that plaintiff's claim against defendant Samuel-Whittar Steel, Inc. (hereafter defendant), for negligent retention of defendant Michael Brown (hereafter Brown) was correctly dismissed as a matter of law. At the very least, plaintiff raised a genuine issue of material fact regarding whether information about Brown's "'habits, temperament, or nature,'" which was reported to his employer, gave the employer sufficient notice of Brown's acts of "'impropriety, violence, or disorder,'" see *Hersh v Kentfield*

*Builders, Inc*, 385 Mich 410, 413; 189 NW2d 286 (1971), quoting 34 ALR2d 390, § 9, so as to make the employer liable for negligently retaining him.

Plaintiff, a then-23-year-old night security guard who was assigned by her employer to work at defendant's plant, was raped by Brown after he forced plaintiff into a women's restroom while she was checking to make sure a block of offices was secure. Brown was a midnight foreman employed by defendant.

In the months leading up to this rape, Brown had made sexually aggressive comments to plaintiff on a daily or near-daily basis. In fact, plaintiff's coworker testified that plaintiff frequently locked the door to her guard shack and pretended that she was asleep to prevent Brown from entering and to discourage him from speaking to her.

Plaintiff reported Brown's conduct not once, not twice, but at least three times to Brown's supervisor, defendant Harlan Gardner. Plaintiff told Gardner, the plant manager, that Brown continually made crude sexual comments to her, and she asked Gardner to make Brown stop. Three other security guards informed plaintiff that they, too, had complained to their superiors regarding Brown's conduct. Plaintiff also asked Brown to stop making the comments on numerous occasions. Despite these multiple complaints, and despite Gardner's telling plaintiff each time that he would "take care of it," Brown continued to

2

bombard plaintiff with his sexually aggressive comments until he eventually raped her.[1]

Nothing in *Hersh*, the case on which the majority relies, compels a conclusion that repeated, sexually aggressive comments duly reported to an employer can never put the employer on notice that the offending employee "'may eventually commit an assault . . . .'"[2] *Hersh*, *supra* at 413, quoting 34

---

[1] The majority opines that plaintiff's personal failure to predict Brown's potential to carry through with his verbally expressed desire to commit a sexually violent act involving her "weighs definitively against imposing a duty on defendant." *Ante* at 12; see also *ante* at 11 n 24. The obligation to assess its employee's fitness for a job falls on the employer, not on the victims of that employee's actions. Many times an employee will have no idea of another employee's propensity for violence; certainly a member of the public would not. Thus, it is the employer's job to gauge whether a particular employee is fit to remain in a position or in the workplace. Indeed, the essence of a negligent retention claim is that the *employer* breached a duty to ensure that the workplace was safe. The fact that plaintiff did not interpret the comments as harbingers of the rape is immaterial. Moreover, she did report the comments, which definitively placed the duty on defendant to assess the danger, if any, and respond appropriately. It is for the jury to determine whether defendant decided correctly.

The majority's statement places an irrational burden on employees that will result in complaints going unheeded. Now, an employee must specifically state to an employer, "I believe that I might be killed," or "I believe that I might be raped." I can only imagine how quickly the reaction of supervisory staff will shift from concern and diligence to apathy from a sense that employees are overreacting and "crying wolf."

[2] Despite its assertion to the contrary, *ante* at 11 ("We do not hold that an employee's words alone can *never* create a duty owed by the employer to a third party."), the majority does find that sexually aggressive comments can never put an employer on notice. See *ante* at 2. The majority holds that absent a criminal record or violent history, an employer cannot be held liable, "solely on the basis of the employee's lewd comments," for a rape the employee commits. *Ante* at 2. If the majority believed that some comments could, depending on the circumstances,

(continued…)

3

ALR2d 390, § 9. In *Hersh*, this Court quoted these pertinent words from the ALR to describe an employer's duty in relation to hiring or retaining employees:

> "[A]n employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, *by habits, temperament, or nature*, to deal with the persons invited to the premises by the employer. The employer's knowledge of *past acts of impropriety, violence, or disorder* on the part of the employee is generally considered sufficient to forewarn the employer who selects or retains such employee in his service that he may eventually commit an assault, although not every infirmity of character, such, for example, as dishonesty or querulousness, will lead to such a result." [*Hersh*, *supra* at 412-413, quoting 34 ALR2d 390, § 9 (emphasis added).]

Critically, the duty of an employer is set forth in the first sentence of the quoted passage: an employer has the duty to use "due care" in selecting or retaining employees. The balance of the passage simply provides guidance on what will generally be considered forewarning of a potentially dangerous employee. But when there are no known "past acts of impropriety, violence, or disorder," the duty of the employer is not changed or lessened because knowledge of "past acts of impropriety, violence, or disorder" is not the only mechanism by which an employer can be forewarned of potentially assaultive behavior. Further, the ALR passage does not restrict the term "impropriety,

---

(...continued)

suffice, then it would find a genuine issue of material fact for the jury in the present case. But even if its opinion were internally consistent, the majority's artificial line-drawing ("This obviously would be an entirely different case if Brown had threatened to rape plaintiff and defendant was aware of these threats," *ante* at 11), reinforces that assessing whether particular comments should put an employer on notice is a factual matter for the jury.

4

violence, or disorder" in any way, although the majority appears to restrict the phrase to mean only violent acts or, at best, specific words it has arbitrarily decided would suffice. See *ante* at 10-11 and n 24.

Under a proper understanding of the principles of negligent retention, it is clear that plaintiff presented a genuine issue of material fact with respect to whether defendant breached its duty to use due care in retaining Brown in light of defendant's knowledge of how Brown was conducting himself in the workplace. Given plaintiff's allegations, it is for a jury to decide whether defendant's knowledge of Brown's actions sufficiently alerted defendant that there was a potential for assault and, if so, whether defendant should have investigated the situation or taken any corrective action.

And the majority errs in concluding that *Hersh* precludes plaintiff's claim as matter of law. First, although our state's published cases addressing negligent-retention claims involve facts such as a past history of violence or records of fear expressed by employees, this in no way precludes a case in which a past history of violent behavior is lacking from reaching a jury. An employer has a duty to use due care in retaining an employee, and any number of things can suffice to provide notice to the employer that its retention of a particular employee may need a second look. Here, certainly Brown's conduct, which consisted of

repeatedly telling his subordinate[3] that he wanted to commit a violent sexual act involving her, can be considered "'habits, temperament, or nature'" suggesting that he was "'unworthy . . . to deal with the persons invited to the premises by the employer'" because of a potential for assaultive behavior. *Hersh*, *supra* at 413, quoting 34 ALR2d 390, § 9. Indeed, the multiple reports of this conduct to the plant manager should have provided some indication to defendant that Brown was unfit to be a supervisor, much less an employee, and that he may have the potential for assault given his unambiguous indications that he wanted to "fuck" plaintiff and pull her hair.[4] Moreover, certainly Brown's past conduct toward plaintiff would fall into the category of "impropriety" and perhaps "disorder," which disorder may signal to a reasonable employer that Brown had the capacity to commit an assault on plaintiff.[5] Because a reasonable jury could reach that

_____

[3] Plaintiff was Brown's subordinate in the sense that she was to report to him any problems she encountered on her shift or anything that was amiss in the plant. In fact, he was the only person to whom plaintiff could report because he was the midnight foreman and the sole person with authority in the plant. He did not, however, have the authority to, as his boss described, "tell [plaintiff] what to do."

[4] Might this not be equated with Brown saying he wanted to "rape" plaintiff and pull her hair?

[5] The majority misconceives my position as broad and all-encompassing. But I do not contend that "every inappropriate workplace comment could supply sufficient notice of an employee's propensity to commit future violent acts . . . ," *ante* at 13, nor do I assert that "any inappropriate workplace speech . . . is sufficient to create a jury-submissible question of negligent retention," *ante* at 19. I do not even believe that sexually charged speech in every situation should put an employer on notice of a potential assault. Rather, I believe that in this particular

(continued…)

same conclusion, whether the employer was on notice is a factual matter, as the Court of Appeals correctly found. And this is all the more true given that the person Brown was harassing on the night shift was a subordinate female who worked, to a large extent, alone.

The majority justifies its holding by opining that "[m]odern workplace speech is, at times, boorish and undesirable . . . ." *Ante* at 13.[6] But a function of the majority's rejection of a blanket rule that would "treat every employee who makes inappropriate workplace comments as a potentially violent criminal," *ante* at 14 is an equally dangerous rule that *no* workplace speech can form the basis for a negligent-retention claim. Although the majority points to the principle that "'"not every infirmity of character'" is sufficient to forewarn the employer of its employee's violent propensities," *ante* at 13, quoting *Hersh*, *supra* at 413, quoting 34 ALR2d 390, § 9, the majority allows for *no* infirmity of character, shown by speech, to be sufficient to allow a jury to decide whether, in light of the employee's conduct, the employer had a duty to act. See *ante* at 2, 10-11. Thus,

---

(…continued)
case, and under these particular facts, a question for the jury was created. And while the majority opinion is rife with suggestion that I have concluded that defendant was liable for this rape, I make no such conclusion. But neither do I conclude that, as a matter of law, defendant cannot be found liable.

[6] "Boorish" is defined as "[l]ike a boor; rude; ill-mannered." *The American Heritage Dictionary, New College Edition* (1981). Certainly Brown's telling plaintiff that he wanted "to fuck [her] and pull [her] long hair," that he liked how she "sh[ook] her ass," that she "ha[d] big tits," and that he had "something she can suck on" goes miles beyond being "boorish."

the majority creates its own new rule, inconsistent with *Hersh* and the ALR passage, that *as a matter of law*, employers who are notified that an employee is verbally harassing another in a sexually aggressive way can never be held liable for retaining that employee if that employee undertakes to carry out the sick sexual fantasies that employee has been verbalizing. *Id.* This in turn means that employers need not respond to complaints about such matters, thus eliminating another workplace protection for innocent employees.[7]

The majority also predicts that "[a]n employer diligently seeking to avoid such broad tort liability would inevitably err on the side of over-inclusiveness and cast a wide net scrutinizing *all* employee speech that could be remotely construed as threatening." *Ante* at 13 (emphasis in original). First, I disagree that the status quo of allowing a jury to determine whether, under the totality of the circumstances, an employer should have been on notice is "broad tort liability."[8]

---

[7] Interestingly, the majority concludes that Brown's "boorish" speech was "no predictor at all of future criminal behavior . . . ." *Ante* at 13. I beg to differ and believe that the facts speak for themselves. I point out as well that had Brown told plaintiff, "I am going to rape you," and had she reported that to defendant, that, too, under the majority's analysis, would have been insufficient to put defendant on notice that it had a duty to reevaluate Brown's presence in the workplace because defendant had no criminal history or violent past. See *ante* at 2.

[8] The concurring justice's histrionic list of questions and concerns and the majority's overwrought proclamation that my position would render "large numbers of job applicants effectively unemployable," *ante* at 22, again ignores that I do not foster a general rule that all workplace speech has negligent-retention implications. Rather, I only advocate that in this case, and in these particular

(continued…)

8

Moreover, I fail to see why it would not be more desirable to have employers scrutinize threatening speech than to ignore it when reported and have an innocent employee raped. The majority's preferred lower level of employer responsibility will ensure that to the extent that "[m]odern workplace speech is, at times, boorish and undesirable," *ante* at 13, it will remain that way. Last, the same exercise of reviewing an employee's fitness is necessary when the employee has a criminal history or violent past, and just as the presence of a criminal history or violent past will not always be sufficient notice for a negligent-retention claim, neither will every instance of questionable employee speech.[9]

_____

(…continued)
circumstances, there was a question of fact for the jury. Moreover, I would note that the questions Justice Markman poses and others like them apply just as easily to situations in which an employee's criminal history or violent past must be assessed. I would also observe that Justice Markman is quite seriously overreacting to the analysis contained in my dissent by demanding answers to at least 32 questions, not one of which is implicated in this case. Just as in myriad other cases resolved before this one, not every permutation of the facts possibly imaginable needs to be, or should be, resolved. Justice Markman's list of incessant questions is best reserved for the day we are presented with a factual situation that requires us to answer them. But as it is, the outcome that I advocate in this case is simply the result of applying law to facts and is no different than the many other resolutions reached by reviewing courts in which additional, but untimely, questions flow naturally from the answer given.

[9] The majority concludes that "[a]s a general rule, an employer cannot accurately predict an employee's future criminal behavior solely on the basis of the employee's workplace speech." *Ante* at 13. But "accurate prediction" is not the standard for reviewing speech, just as it is not the standard for reviewing conduct or history. No employer can be expected to predict assaultive behavior with 100 percent certainty in any situation. But an employer can be found to have

(continued…)

The particular facts of this case refute the majority's statement, *ante* at 12, that Brown's comments "[stood] alone" and further illuminate why the question in this case is one for a jury. Brown's comments did not "stand alone." Rather, Brown's comments must be assessed in light of the circumstances that existed when he made the comments: Brown was the nightshift plant manager; plaintiff had to comply with Brown's supervisory requests; plaintiff worked alone; few, if any, other people were around or accessible; Brown's comments were relentless over a period of months; plaintiff complained about Brown's behavior to coworkers and Brown's employer; and plaintiff would lock herself in her guard shack to avoid contact with Brown. Brown's behavior cannot be viewed in a vacuum. Perhaps it might be more tempting to characterize Brown's comments as typical "modern workplace speech" were this a typical "modern workplace" environment. In that context, perhaps comments like these might be made when an audience is present—to impress one's buddies or get a laugh from onlookers. But Brown did not make the vast majority of his comments in that type of setting.[10] Rather, he made them to plaintiff late at night when he was acting as

---

(…continued)

been put on notice that an assault "*may eventually*" be committed. *Hersh*, *supra* at 413 (emphasis added).

[10] The record indicates that Brown did make one sexually charged comment to plaintiff in front of another guard. That guard testified that Brown approached plaintiff when plaintiff was eating a "Blow Pop" lollipop. Brown stated, "I got something better [than] that you can suck on." The guard responded by telling Brown not to speak in that manner.

(continued…)

10

her supervisor and no one else was around. He made them for no one to hear but her. These unique circumstances should prevent the majority from chalking up Brown's comments to "modern workplace speech" and, consequently, removing from the jury the question whether the comments were potentially harbingers of dangerous behavior.

And unlike the majority, I do not believe that the Court of Appeals "expanded" an employer's duty at all. See *ante* at 22. As discussed, "[A]n employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, *by habits, temperament, or nature*, to deal with the persons invited to the premises by the employer." 34 ALR2d 390, § 9 (emphasis added). Whether this employer knew or should have known that Brown's "habits, temperament, or nature" made him unfit to supervise plaintiff on a sparsely populated nightshift because of the *potential* for assault (as opposed to the *certainty* of an assault) was a question for the jury. Also for the jury to decide was whether defendant breached its duty to keep

---

(…continued)

In response to the majority's statement, *ante* at 4 n 5, that the record is unclear regarding when Brown made his comments, I would note that although plaintiff, at one point, stated that the comments began on the afternoon shift, she stated immediately afterward, and several other times during her deposition, that she did not meet Brown until she was transferred to the midnight shift. As such, it appears she may have misspoken with respect to the comments occurring on the afternoon shift. But in any event, aside from the comment regarding the lollipop, there is no record evidence that any comments were made in front of any other person at any other time.

11

plaintiff safe by failing to take any corrective action once it had knowledge of Brown's relentless harassment.[11] As such, the Court of Appeals properly found that a genuine issue of material fact existed regarding whether defendant, having been informed multiple times about Brown's conduct, should be held liable for negligently retaining Brown. Rather than usurp the role of the jury in this matter, I would remand the case for trial.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

---

[11] I do not, as the majority insists I do, seek to eliminate foreseeability in this or similar cases. The majority remains just as confused about my opinion in this regard as it was in *Anderson v Pine Knob Ski Resort, Inc*, 469 Mich 20; 664 NW2d 756 (2003). See *ante* at 12 n 25. Moreover, before claiming a superior ability to apply principles of foreseeability, the majority might review its opinion in *MacDonald v PKT, Inc*, 464 Mich 322; 628 NW2d 33 (2001). There the majority eschewed all notions of foreseeability and refused to hold the defendant liable for the criminal acts of third parties, despite the defendant's knowledge that the particular criminal act at issue had occurred many times before, making it likely that it would occur again. Under the majority's reasoning in *MacDonald*, namely, failing to find foreseeability when it clearly existed, the majority would be forced to conclude that Brown's act was not foreseeable, even if he had raped before.